AO 91
Rev. 11/82

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. KARENA CHUANG | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. 11 2751M |

Complaint for violations of Title 8, United States Code, Sections 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents), 2 (Causing an Act to be Done)

| NAME OF MAGISTRATE JUDGE | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE September 20, 2010 | PLACE OF OFFENSE Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about September 20, 2010, in Los Angeles County, within the Central District of California, defendant KARENA CHUANG caused to be possessed, obtained, accepted, and received, a document prescribed by statute and regulation for entry into and as evidence of authorized stay and employment in the United States, that is, an M-1 Student Visa for a student with the initials A.M.N.H. to attend Pinnacle Aviation Academy, knowing it to have been procured by means of a false claim and statement, and to have been otherwise procured by fraud and unlawfully obtained, in violation of Title 18, United States Code, Sections 1546(a), (2).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **GEORGE KWAI** |
|---|---|
| | OFFICIAL TITLE Special Agent - Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) ANDREW J. WISTRICH | DATE November 17, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA ROZELLA A. OLIVER   REC: Detention
RAO

# A F F I D A V I T

I, George Kwai, being duly sworn, hereby depose and state as follows:

1.   I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), Homeland Security Investigations ("HSI"), and have been so employed since January 2010.  I am currently assigned to the Counter-Terrorism and Criminal Exploitation Unit ("CEU") for the Los Angeles Office of the Special Agent in Charge.  Since entering duty, I have conducted numerous investigations of individuals from special interest countries which have led to multiple arrests.  In addition, I was co-case agent in the investigation of a major visa-fraud scheme involving numerous foreign national students.  I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I attended Criminal Investigator Training and ICE/HSI Special Agent Training.

2.   This affidavit is made in support of an application for a criminal complaint charging Karena CHUANG with violations of Title 8, United States Code, Section 1324 (Bringing In and Harboring Certain Aliens), and Title 18, United States Code, Sections 1546 (Fraud and Misuse of Visas, Permits, and Other Documents), 2 (Causing an Act to be Done), and Section 371 (Conspiracy to Commit Offense or to Defraud United States).

1

3.    This affidavit is also submitted in support of applications for four search warrants to search the following locations described further in paragraph 6 and in Attachment A:

a.   the business of Karena CHUANG, Wright Aviation Academy, located at 1100 Puddingstone Drive, La Verne, California 91750.

b.   the residence of Karena CHUANG, located at 40 Villa Milano, Lake Elsinore, California 92532.

c.   a silver Mercedes Benz SLK, two-door roadster operated by CHUANG and registered to Li Chu Lin, CHUANG's mother, with California license plate # 4YVM208.

d.   a silver and black Sony laptop owned by CHUANG.

4.    The facts set forth in this affidavit are based upon (1) my personal involvement in this investigation; (2) information obtained from other law enforcement officers and witnesses; (3) my review of reports and other documents related to this investigation; and (4) my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of, or the government's investigation into the matters described herein.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance

2

and in part only.

5.    Based on the facts set forth below, I believe probable cause exists to believe that Karena CHUANG has fraudulently assisted foreign students in applying to government-approved flight schools or language schools for visa documents allowing the foreign students to enter the United States for the purported purpose of attending these approved schools when in fact CHUANG knew that these students would be attending Blue Diamond Aviation, a non-certified flight school owned and operated by CHUANG and located in La Verne, California.   As a non-certified flight school, Blue Diamond Aviation was not authorized to have foreign nationals enrolled solely for the purpose of attending its commercial pilot training program.   In or about mid-July 2011, CHUANG closed Blue Diamond Aviation and shortly thereafter opened another non-SEVP-approved flight school named Wright Aviation Academy.   As set forth herein, I believe probable cause exists to believe that evidence of CHUANG's criminal activity will be found at Wright Aviation Academy as well as at her residence, in her vehicle, and on her personal laptop.

## PREMISES TO BE SEARCHED

6.    The premises to be search are described as follows and in Attachment A:

3

   a. <u>Wright Aviation Academy located at 1100</u>

<u>Puddingstone Drive, La Verne, California 91750</u> ("CHUANG's

Business").  The premises is further described as a single-story

building on the northwest side of Brackett Field Airport.  The

building is painted white with blue trim along the rook of the

building.  The front of the building faces north towards

Puddingstone Drive and has two glass door entrances.  The rear

of the building has two glass door entrances that face south

towards the tarmac of Brackett Field.  There is a parking area

directly in front of the building.  The front of the building

has a blue banner that says, "Wright Aviation Academy," and

"ShongMai International Group," in black font.  The banner also

contains Chinese characters.

   b. <u>40 Villa Milano, Lake Elsinore, California 92532</u>

("CHUANG's Residence").  The premises is further described as

a two-level single family residence with white walls and a red

Spanish style roof.  There is a three-car garage in the front of

the residence to the right of the main entrance.  The home is on

the east side of Villa Milano, and the front of the house faces

west. The second floor of the residence has a small patio

overlooking Villa Milano.  The number "40" is painted on the

curb directly in front of the residence.

4

      c.    <u>Silver Mercedes Benz SLK two-door roadster</u>,
California license plate # 4YVM208 operated by CHUANG and
registered to Li Chu Lin, CHUANG's mother ("CHUANG's Vehicle").

      d.    <u>A silver and black Sony laptop</u> owned by CHUANG
("CHUANG's Computer").

<strong>LEGAL AND REGULATORY BACKGROUND</strong>

<strong>The Form I-20M-N and the M-1 Student Visa Process</strong>

    7.   Based on my training and experience, my participation
in this and other investigations, and conversations with other
experienced investigators, I know the following:

      a.    A foreign student who wishes to enter and remain
in the United States on a temporary basis to attend a flight
training institution must first obtain an M-1 nonimmigrant visa
("M-1 student visa").

      b.    In order to obtain an M-1 student visa, a foreign
student must apply to study at a flight training institution
within the United States that has been certified by the United
States government to enroll and train foreign students.  Upon
acceptance, the flight training institution will provide to the
foreign student a Certificate of Eligibility for Nonimmigrant
(M-1) Student Status - For Vocational Students ("Form I-20M-
N").

5

c.   The Form I-20M-N certifies in part that the foreign student meets admission requirements and will pursue a full course of study.   The Form I-20M-N is required in order for the student to obtain an M-1 student visa.

d.   Only flight-training institutions that have been certified by the Student and Exchange Visitor Program ("SEVP") are authorized to issue a Form I-20M-N to foreign students.   A school may not issue Forms I-20M-N until the school has been notified by SEVP that it is certified to issue Forms I-20M-N.

e.   The Form I-20M-N is one of the two main types of Forms I-20, the Form I-20A-B being the other.   The Form I-20M-N is issued to M-1 vocational students, including flight school students, and the Form I-20A-B is issued to F-1 academic and language students.   Both the Form I-20A-B and the Form I-20M-N are commonly referred to simply as the Form "I-20."

## The SEVIS System

8.   Section 641 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Public Law 104-208, Div. C (Sept. 30, 1996), directs the Attorney General to develop and conduct a program to collect current information, on an ongoing basis, from schools and exchange programs relating to nonimmigrant foreign students and exchange aliens during the course of their stay in the United States.   The Student and

Exchange Visitor Information System ("SEVIS") was implemented to fulfill this requirement.

a.    SEVIS is an Internet-based system that provides users with access to accurate and current information on nonimmigrant foreign students, exchange aliens, and their dependents.  SEVIS enables SEVP-approved schools to transmit electronic information and event notifications, via the Internet, to the Department of Homeland Security and the Department of State throughout a student's or exchange alien's stay in the United States.

b.    As stated above, only a SEVP-approved school can issue a Form I-20.  In order to create a Form I-20, the SEVP-approved school accesses SEVIS and enters the foreign student's information electronically, thus instantly allowing collection of the data in a central database before the form is ever printed.  All schools certified by SEVP must be using SEVIS in order to accept foreign students.  Schools not certified by SEVP are not granted access to SEVIS to create Forms I-20.  Only Forms I-20 for F-1 or M-1 students generated from SEVIS can be used for entry into the United States, change of nonimmigrant classification, reinstatement, transfer, extension, or any other immigration benefit.

7

c.    Each SEVIS Form I-20 that is issued by a school to a student will contain a system-generated identification number.  This number is referred to as the SEVIS ID number.  The SEVIS ID number remains the same as long as the student maintains his or her valid, original nonimmigrant status.  This number will remain the same regardless of any changes or updates made by the school to the student's record.

d.    When a foreign student is inspected for admission into the United States, he or she will show the SEVIS Form I-20 to the inspecting officer and the inspecting officer will record the SEVIS ID number.  The inspector will then return the student's copy to the student with the appropriate entry stamp.  SEVIS is the method through which immigration officials are able to determine which foreign students are properly in the United States attending school.  If a foreign student fails to maintain his student status or is deemed to have violated the terms of his/her M-1 student visa, then the student is no longer authorized to stay in the United States.

**FAA Part 61 and Part 141 Flight Schools**

9.    Part 61 and Part 141 of Title 14 of the Code of Federal Regulations govern two main types of flight schools regulated by the Federal Aviation Administration ("FAA").

a.    Flight schools approved by the FAA under 14 CFR 141 must meet certain requirements established by the FAA and submit their flight-training curriculums for review.   Part 141-approved schools are also subject to regular surveillance audits by the FAA and must meet minimum pass rates on the practical exams.   A 14 CFR Part 61 flight school does not have to meet the same requirements as a Part 141-approved flight school.

b.    Flight schools that are not Part 141-approved by the Federal Aviation Administration, including Part 61 flight schools, are generally ineligible for certification by SEVP to issue Forms I-20 and enroll foreign students.

## Pertinent Criminal Statutes

10.   The Immigration and Nationality Act create criminal penalties for bringing in and harboring aliens. Specifically, Section 1324(a)(1)(A)(iv) of Title 8, United States Code, states, in pertinent part:

Any person who -

encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law shall be [punished as set forth in the statute].

9

11.   Title 18, United States Code, Section 1546 states in pertinent part:

    (a)   Whoever knowingly accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to … have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; shall be [punished as set forth in the statute].

12.   Title 18, United States Code, Section 371 states in pertinent part:

    (a) If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be [punished as set forth in the statute].

## SUMMARY OF INVESTIGATION

**Information from ICE Attache in Cairo, Egypt**

13.   On or about June 16, 2010, U.S. Immigration and
Customs Enforcement Assistant Attache Cairo – Visa Security Unit
representatives interviewed two Egyptian nationals with the
initials K.N.M.A. ("Egyptian National Number One") and
O.K.M.A.A. ("Egyptian National Number Two") in Cairo, Egypt.

a.   Both Egyptian National Number One and Egyptian
National Number Two were issued Forms I-20 by a flight school
named Pacific States Aviation ("PSA") located in Concord,
California, and were applying for M-1 visas for admission into
the United States based on the Forms I-20 issued by PSA.   PSA is
a SEVP-approved FAA Part 141 school located in Concord,
California.

b.   In the course of the interview by ICE Assistant
Attache Cairo agents, both applicants admitted that they had no
intention of attending classes at PSA but instead were planning
to attend flight training at Blue Diamond Aviation.   Both
applicants stated that they were informed by CHUANG that they
would be in fact training at Blue Diamond Aviation.

c.   On or about June 20, 2010, ICE Assistant Attache
Cairo - Visa Security Unit representatives interviewed an
Egyptian national named Ahmed Hassan Saleh.   Saleh stated that

11

he was the boyfriend of CHUANG and informed ICE Assistant Attache Cairo - Visa Security Unit representatives that CHUANG was the owner/operator of an aviation school called Blue Diamond Aviation located in La Verne, California.  Saleh further stated that he had helped direct Egyptian flight students to CHUANG at Blue Diamond Aviation.

14.   From checks of FAA records and conversations with FAA employees, I know that Blue Diamond Aviation was an FAA Part 61 flight school located at 1615 McKinley Avenue in La Verne, California and owned by CHUANG.  According to the SEVIS system and conversations with SEVP officials, Blue Diamond Aviation has never been SEVP-approved and therefore was not authorized to issue Forms I-20 to enroll foreign flight students in its commercial flight training program.

**Encounter of Egyptian Foreign Nationals Enrolled at Blue Diamond Aviation**

15.   After conducting various law enforcement checks in late October 2010, I learned that two Egyptian foreign nationals were enrolled at Blue Diamond Aviation.  On or about November 3, 2010, I interviewed A.E.A.K. ("Egyptian National Number Three") and A.M.N.H. ("Egyptian National Number Four"), the Egyptian nationals enrolled in Blue Diamond Aviation's flight training program, and learned the following:

12

a.    Both Egyptian National Number Three and Egyptian National Number Four had Egyptian passports and stated that they were full-time flight students at Blue Diamond Aviation in the school's professional pilot training program.   Furthermore, both Egyptian National Number Three and Egyptian National Number Four were issued Forms I-20 to attend flight schools other than Blue Diamond Aviation.

b.    Egyptian National Number Three stated that he was issued a Form I-20 from a SEVP-approved flight school called U.S. Flight Academy located in Denton, Texas, and later received an M-1 visa to be admitted into the United States.   Egyptian National Number Three stated that he first heard of Blue Diamond Aviation from his friend named "Ibrahim Mohamed" in Egypt. Egyptian National Number Three never attended U.S. Flight Academy upon entry into the United States but instead went directly to Blue Diamond Aviation.

c.    Egyptian National Number Four stated that he was issued a Form I-20 from a SEVP-approved flight school, Pinnacle Aviation Academy, located in Carlsbad, California, and later received an M-1 visa to be admitted into the United States. Egyptian National Number Four stated that he first heard of Blue Diamond Aviation from his friend, named "Ahmed Hassan Saleh" in Egypt (referenced above in paragraph 13c).   Egyptian National

13

Number Four stated that his friend Saleh helped him apply to Pinnacle Aviation Academy.  Egyptian National Number Four never attended Pinnacle Aviation Academy upon entry into the United States but instead went directly to Blue Diamond Aviation.

      d.   Egyptian National Number Three and Egyptian National Number Four stated that they both lived at housing provided by CHUANG located at 1362 S. White Avenue, Pomona, California.

      e.   Egyptian National Number Three stated that there were two other Blue Diamond Aviation students from Taiwan who also lived at the house located at 1362 S. White Avenue, Pomona, California.

      f.   Egyptian National Number Three and Egyptian National Number Four stated that they chose to attend Blue Diamond Aviation because Blue Diamond Aviation cost less than other schools and that Blue Diamond Aviation was able to provide training in a shorter period of time.  Egyptian National Number Three and Egyptian National Number Four each stated that CHUANG informed them that it was okay for them to train at Blue Diamond Aviation.

   16.  Based on these interviews with Egyptian National Numbers Three and Four, I checked U.S. State Department's Consular Database ("CCD").  A review of that database showed

that Egyptian National Number Four was issued an M-1 visa to attend Pinnacle Aviation Academy in Carlsbad, California on or about September 20, 2010.  A review of the U.S. Department of Homeland Security's Arrival and Departure Information System ("ADIS") showed that Egyptian National Number Four in fact used that M1 visa to enter the United States on or about October 9, 2010.

17.  On or about November 18, 2010, Egyptian National Numbers Three and Four informed me that two more Egyptian nationals had arrived to train at Blue Diamond Aviation the week of November 8, 2010.  Egyptian National Number Three stated that the Egyptian nationals were named "W.S." ("Egyptian National Number Five") and "M.A." ("Egyptian National Number Six").

18.  After receiving this information, I checked various ICE and other law enforcement databases and learned that Egyptian National Number Five and Egyptian National Number Six had entered the United States: Egyptian National Number Five on a B-2 Visitor Visa and Egyptian National Number Six on an M-1 visa.  A check of SEVIS showed that Egyptian National Number Six was supposed to be a student at a flight school named Aero Prep Institute located in Medford, New Jersey.

19.  On or about December 16, 2010, Egyptian National Numbers Three and  Four covertly recorded two conversations

15

between them and CHUANG using a digital recording device
supplied to them by ICE.  Egyptian National Numbers Three and
Four notified me after each recorded conversation of the fact of
the recording, and I shortly thereafter retrieved the taped
conversations.

20.  I have reviewed these two recorded conversations, both
of which occurred on December 16, 2010, and have learned the
following:

a.  CHUANG told Egyptian National Number Three and
Egyptian National Number Four that it was okay for them to study
at Blue Diamond Aviation despite the fact that they had been
issued Forms I-20 from other flight schools.

b.  With respect to Egyptian National Number Three's
Form I-20 which had been issued by a flight school in Denton,
Texas, CHUANG informed Egyptian National Number Three that she
would assist him in getting his Form I-20 from Pinnacle Aviation
Academy and would handle the paperwork for this transfer.

c.  With respect to Egyptian National Number Four,
CHUANG informed Egyptian National Number Four that his Form I-
20, which had been issued by Pinnacle Aviation Academy in
Carlsbad, California, could still be used by Egyptian National
Number Four while he attended Blue Diamond Aviation because
Pinnacle Aviation Academy was a partner school with Blue Diamond

16

Aviation.   CHUANG explained that because Pinnacle Aviation was a partner school, Egyptian National Number Four did not have to take any action with respect to his Form I-20.

21.   On or about January 6, 2011, Egyptian National Number Three notified me that he had received a phone call from CHUANG, a call that he recorded.   Egyptian National Number Three informed me that in this call CHUANG told Egyptian National Number Three that she had his Form I-20 and would meet him that same day at the flight school to give it to him.

22.   Upon learning about this planned meeting, I along with several other ICE agents went to Blue Diamond Aviation and set up a surveillance.   Later that afternoon CHUANG arrived at the flight school and met with Egyptian National Number Three. After talking to Egyptian National Number Three for several minutes, the meeting ended.   After the meeting ended, Egyptian National Number Three met with me and handed me a piece of paper that he said CHUANG had provided him.   The piece of paper appeared to be a Form I-20.   The purported Form I-20 was a photocopy and not an original.   The form contained Egyptian National Number Three's name and other biographical information. The form purported to be issued by Pinnacle Aviation Academy and signed by Catherine Fair on October 2, 2010.

23.   A few days after this meeting between CHUANG and

17

Egyptian National Number Three, on January 11, 2011, Egyptian National Number Three had another recorded conversation with CHUANG.  I have listened to that recording, and based on this review, know that in this call CHUANG informed Egyptian National Number Three that he could use the Form I-20 that she had given him even though it was a photocopy for immigration purposes and that he could keep the Form I-20 in his passport.

24.  On March 10, 2011, I received information from T-Mobile for the call records of Egyptian National Number Three's phone number (909-538-7412) and from AT&T for the call records of CHUANG's phone number (949-331-8884).  These records confirm that the recorded calls described above between Egyptian National Number Three and CHUANG in fact occurred.

25.  Based on my training and experience and my conversations with other investigators, it appears that the Form I-20 issued by CHUANG to Egyptian National Number Three was a draft Form I-20.  I believe the document was a draft because the Form I-20 issued by CHUANG did not have the header and footer of an official Form I-20.  Also, the paper provided by CHUANG to Egyptian National Number Three did not contain a SEVIS ID number and accompanying SEVIS-generated barcode.  According to my conversations with SEVP officials, a draft Form I-20 is a document that can be generated from SEVIS and may be used by a

18

school to verify with the perspective student whether all of the information is correct before the official Form I-20 is issued.

26. The SEVIS system maintains records of all Forms I-20 issued by all SEVP-approved schools, including draft Forms I-20. On or about January 13, 2011, SEVP officials checked the SEVIS records for Pinnacle Aviation Academy and confirmed to me that no Forms I-20 or draft Forms I-20 had been issued by Pinnacle Aviation Academy to a student with Egyptian National Number Three's name.

**Interview of Pinnacle Aviation Academy Officials**

27. On or about January 19, 2011, I went to Pinnacle Aviation Academy in Carlsbad, California and met with its owner, George McJimsey, and general manager, Cathe Johnson. Pinnacle Aviation Academy provided me with the names of all of the students to whom they had issued a Form I-20 (including draft Forms I-20) in the past few months. I reviewed the files of all the students, including an Egyptian national named I.A. ("Egyptian National Number Seven"). According to Pinnacle's records, Egyptian National Number Seven was denied a visa and never enrolled at the flight school.

28. While examining the Form I-20 and draft Form I-20 that was issued by Pinnacle Aviation Academy to Egyptian National Number Seven, I could see that Egyptian National Number Seven's

19

Form I-20 and draft Form I-20 had some of the same information that was contained in the purported Form I-20 that was provided by CHUANG to Egyptian National Number Three. For example, the student's personal financial information in both the Form I-20 issued by Pinnacle Aviation Academy to Egyptian National Number Seven and the Form I-20 issued by CHUANG to Egyptian National Number Three were exactly the same. Furthermore, the training period dates and the student's average costs of attendance on both of the Forms I-20 were exactly the same.

29. That same day, January 19, 2011, I interviewed Pinnacle Aviation's general manager, Cathe Johnson, about Egyptian National Number Seven's application to attend the flight school and learned the following:

a. Cathe Johnson informed me that she remembered she was in contact with a female named "Jessika" regarding Egyptian National Number Seven's application. Johnson stated that she never met Jessika in person but had spoken to her numerous times over the telephone and via email. Jessika claimed to be Egyptian National Number Seven's cousin and also stated that she lived in the local California area. Johnson stated that she remembered Jessika sounded young and spoke English well with a slight accent. (This description of Jessika's voice is consistent with the voice heard on the recordings between CHUANG

and Egyptian National Number Three.)

    b.    Cathe Johnson noted that Jessika asked many

questions about flight training and also about Pinnacle

Aviation's application process.

    c.    Cathe Johnson stated that it was common for

Pinnacle Aviation to email draft copies of the Form I-20 to

students in order for the students to double check their

biographical information before the final form was issued.

Johnson stated that a draft copy of Egyptian National Number

Seven's Form I-20 was emailed to Egyptian National Number Seven

and possibly to Jessika.

    d.    In addition to alleging to be Egyptian National

Number Seven's cousin, Johnson informed me that Jessika also

claimed to be the cousin of Egyptian National Number Four (as

described above, Egyptian National Number Four enrolled at Blue

Diamond Aviation and cooperated with ICE in obtaining recorded

conversations with CHUANG) and assisted Egyptian National Number

Four with his application to Pinnacle Aviation Academy.

Egyptian National Number Four was subsequently issued a Form I-

20 from Pinnacle Aviation Academy.

    e.    Pinnacle Aviation's records indicated that

Jessika's phone number was 951-245-0135 and her email address

was jessikalichulin@yahoo.com.  Johnson showed me a number of

21

emails that contained correspondence between Pinnacle Aviation and the email account jessikalichulin@yahoo.com.

      f.   Pinnacle Aviation Academy officials told me that they had no partnerships with any other flight schools.

    30.  I have reviewed information provided by Verizon for records pertaining to "Jessika's" phone number 951-245-0135, and I have learned that the name on the account is Li Chu Lin and the service address is 40 Villa Milano, Lake Elsinore, California 92532.  Based on my review of immigration information related to CHUANG, I know that Li Chu Lin is CHUANG's mother. The call records confirm that this phone number called Pinnacle Aviation Academy.

    31.  A check of California Department of Motor Vehicles (DMV) records revealed that 40 Villa Milano, Lake Elsinore, California is CHUANG's Residence.

    32.  On or about January 25, 2011, I returned to Pinnacle Aviation Academy and showed a copy of the Form I-20 given by CHUANG to Egyptian National Number Three to Pinnacle Aviation Academy officials Cathe Johnson, George McJimsey, and Brandi Johnson. Both Cathe Johnson and Brandi Johnson stated that they did not recognize the Form I-20 and were not familiar with a student named Egyptian National Number Three.  Cathe Johnson further stated that the signature next to her name was not her

real signature and believed that it was a forgery.   Cathe

Johnson and Brandi Johnson double-checked their records and

confirmed that there was no student named Egyptian National

Number Three at Pinnacle Aviation Academy and that there was no

record of an application to the flight school from a person with

this name.

33.   As noted above, "Jessika" alleged she was Egyptian

National Number Four's cousin in her dealings with Pinnacle

Aviation Academy.   Email records provided to me by Pinnacle

Aviation Academy contained correspondence with an email

purporting to belong to Egyptian National Number Four –

amnh114@yahoo.com.   After learning of this email address, I

spoke to Egyptian National Number Four again in February 2011.

Egyptian National Number Four's initials are "AMNH" and his day

of birth is November 4.   Egyptian National Number Four informed

me that he did not have a cousin named Jessika and that the

email account amnh114@yahoo.com was not his email address.

34.   During this investigation, I learned that CHUANG uses

the email account karena@bluediamondaviation.net.   In April

2011, pursuant to a federal search warrant, I reviewed the

contents of the email account.   In the course of my review, I

found a number of emails between Egyptian National Number Four

and CHUANG that were sent on or about the same time period that

23

Egyptian National Number Four's application was being processed by Pinnacle Aviation Academy.  Specifically, I learned the following:

      a.   Egyptian National Number Four used the email address hamakabad@hotmail.com to communicate with CHUANG.

      b.   In an email dated July 14, 2010, Egyptian National Number Four sent an email to Blue Diamond Aviation expressing his interest in training there.

      c.   In a series of emails between August 8, 2011 and September 1, 2010, CHUANG and Egyptian National Number Four discussed Egyptian National Number Four's deposit paid to Blue Diamond Aviation and the Form I-20.  On August 11, 2010, Egyptian National Number Four asked CHUANG if CHUANG had received Egyptian National Number Four's $3,200 deposit.  CHUANG responded that she had received the deposit on August 10, 2010.  CHUANG further told Egyptian National Number Four that she had completed his enrollment process with immigration and would send out the Form I-20 once Blue Diamond got the approval.  CHUANG subsequently sent Egyptian National Number Four a copy of a draft Form I-20 that listed the school Egyptian National Number Four would be attending as Pinnacle Aviation Academy.  Egyptian National Number Four later informed CHUANG that he had received

the Form I-20 from "Ahmed Hassan" (referring to Ahmed Hassan Saleh).

**Interview of Pacific States Aviation Academy Officials**

35.   On or about February 10, 2011, I traveled to Pacific States Aviation (PSA) located in Concord, California and spoke with Jennifer Farmer, the Customer Service Representative, and Greg Holbrook, the owner of PSA.   Jennifer Farmer informed me that she remembered an individual named Jessika had assisted with the applications of five Egyptian nationals to the flight training program at PSA.   Ms. Farmer showed me the files of the following five students: Egyptian National Numbers One and Two, M.E. ("Egyptian National Number Eight"), H.E. ("Egyptian National Number Nine"), and M.K. ("Egyptian National Number Ten").   Upon reviewing the files, I saw email correspondence between jessikalichulin@yahoo.com (the same email account used by Jessika to correspond with Pinnacle Aviation Academy) and PSA regarding the five Egyptian nationals.   My review of the emails between PSA and Jessika uncovered the following information:

a.   A majority of the emails sent from jessikalichulin@yahoo.com are signed either "Jessika" or "JL" at the bottom of the messages, or have no name at all.   However, in an email dated July 13, 2010 from jessikalichulin@yahoo.com to PSA, the name "Karena" is signed at the bottom of the message.

b.   In a message sent to PSA by an email account purporting to belong to Egyptian National Number Eight dated May 20, 2010, Egyptian National Number Eight appeared to instruct the PSA official to send his Form I-20 directly to Jessika Lin and provided Jessika's address as 40 Villa Milano, Lake Elsinore, California 92532 (CHUANG's Residence).

c.   In a message sent to PSA by an email account purporting to belong to Egyptian National Number Two to PSA dated May 24, 2010, Egyptian National Number Two informed PSA that Jessika would pay his enrollment fee and the fees of his two other cousins (believed to be Egyptian National Number One and Egyptian National Number Ten) and instructed PSA to mail his PSA "invitation form" to Jessika at 40 Villa Milano, Lake Elsinore, California 92532 (CHUANG's Residence).

d.   In an email dated May 20, 2010 from Jessika to PSA, Jessika stated that she would pay the PSA application fees of $300 each for Egyptian National Number Eight and Egyptian National Number Nine.  Jessika further stated that she was the cousin of Egyptian National Number Eight and Egyptian National Number Nine.  Jessika provided her Mastercard credit card with account number ending in 7598 for payment.

e.   In an email dated May 26, 2010 from Jessika to PSA, Jessika informed PSA that it was "ok" to charge her credit

26

card for the three "new" students (the three "new" students referred to are Egyptian National Numbers One, Two and Ten).

f.   The PSA files of Egyptian National Numbers One, Eight, Nine, and Ten all contained payment receipts that showed their $300 application fees were paid by Jessika's Mastercard credit card with account number ending in 7598.

36.   A review of information received from Citibank for records pertaining to Mastercard account number ending in 7598 revealed that that the cardholder for this account was Li Chu Lin (CHUANG's mother) at 40 Villa Milano, Lake Elsinore, California 92532 (CHUANG's Residence).   The credit card statements showed a total of five separate payments to PSA from Li Chu Lin, each for $300.

**Review of contents of email account jessikalichulin@yahoo.com**

37.   In February 2011, pursuant to a federal search warrant to search the contents of email account jessikalichulin@yahoo.com, I learned the following information:

a.   Subscriber information provided by Yahoo! showed that the zip code provided by the subscriber was "92532, which is a zip code used for Lake Elsinore, California.   The subscriber's listed date of birth is the same as CHUANG's date of birth.

b.   The subscriber information further showed that the registration IP address for jessikalichulin@yahoo.com was 108.0.81.225.  Information provided to me by Verizon showed that the account address for IP address of 108.0.81.225 for the registration date of this email account was 40 Villa Milano, Lake Elsinore, California (CHUANG's Residence).

38.   As discussed above, representatives of Pinnacle Aviation Academy and PSA shared with ICE email correspondence with Egyptian nationals on email accounts purporting to belong to those individuals.  As part of the investigation, I reviewed the subscriber information for these email accounts, including the email accounts purporting to be the email accounts for Egyptian National Numbers Two, Four and Eight.  I have learned the following from the subscriber information:

a.   The registration IP address for all three email addresses mentioned above was 108.0.81.225, which as previously mentioned, is the same registration IP address of jessikalichulin@yahoo.com and has an account address that is CHUANG's Residence.

b.   I have also examined which IP addresses were used to log onto the accounts of jessikalichulin@yahoo.com, as well as the email accounts purporting to be the email accounts for Egyptian National Numbers Two, Four, and Eight, and have learned

28

that each of the email addresses has frequently been logged onto on the same day using the same IP address. For example, on September 10, 2010, all four email addresses mentioned above were logged onto using IP address 108.0.81.225, the same IP address associated with CHUANG's Residence that was used to register all the email addresses.

c. Not all of the IP addresses used to log onto these accounts were IP addresses resolving to CHUANG's Residence. Some of the IP addresses trace to overseas locations including Taiwan and Egypt. When I learned this information, I examined CHUANG's overseas travel. Based on my investigation, I have determined that the overseas IP addresses utilized to log onto these accounts are consistent with CHUANG's overseas travel. For example, based on my query of the Advance Passenger Information System maintained by U.S. Customs and Border Protection, I know that CHUANG was overseas from September 20, 2010 through November 1, 2010. During this time period, the email accounts amnh114@yahoo.com, jessikalichulin@yahoo.com, and the account purporting to belong to Egyptian National Number Eight were logged onto from IP addresses in Taiwan on or about September 24, 2010.

**Bank Records of Blue Diamond Aviation**

39.   I have reviewed the bank records for Blue Diamond Aviation (Bank of America Account #22277-03929 and Account #23410-40080) and learned that from April to August 2010, there were wire transfers from Egypt into Blue Diamond Aviation's account for "educational expense" and "study fees."  These wires were either by or on behalf of Egyptian nationals with whom CHUANG had corresponded concerning their enrollment at Blue Diamond Aviation, including Egyptian National Number Four, Egyptian National Number One (the individual interviewed by ICE Attache Cairo), and Egyptian National Number Eight.  I believe these wires were down payments for flight training at Blue Diamond Aviation.

**Other Foreign Nationals Assisted by "Jessika"**

40.   Based on the information described above, I believe CHUANG is illegally enrolling foreign nationals in Blue Diamond Aviation's flight training program.  In so doing, CHUANG has arranged for these foreign nationals to fraudulently obtain Forms I-20 from SEVP-approved flight schools to enable the foreign nationals to obtain M-1 visas to enter the United States.  To carry out this scheme, CHUANG has used the "Jessika" alias to submit the required paperwork to the certified flight schools.  Posing as "Jessika," CHUANG provided the certified

30

flight schools with email accounts purporting to belong to the foreign nationals, accounts created and controlled by CHUANG.

41.   As part of this investigation, including reviews of the contents of email accounts jessikalichulin@yahoo.com and karena@bluediamondaviation.net, interviews of SEVP-approved flight schools CHUANG has contacted to obtain Forms I-20 on behalf of foreign nationals, I further believe CHUANG has facilitated the illegal entry of over a dozen foreign nationals from Egypt and other countries and has been carrying this scheme out since as early as November 2006.  Specifically, I believe CHUANG has been carrying out this scheme since 2006 based on my review of the contents of the email account karena@bluediamonaviation.net:

a.   In an email dated November 25, 2006, CHUANG sent a message to an unidentified student named David in response to David's question whether Blue Diamond issued Forms I-20;

b.   In her response, CHUANG informed David that "we have a school who is willing to give our student I-20 visa for 1 year."

c.   Based on this email, I believe that CHUANG has been fraudulently obtaining Forms I-20 from other SEVP-approved schools to enroll and train foreign nationals at Blue Diamond since at least 2006.

42.   Two illustrative examples of the scheme involve the foreign nationals Egyptian National Number One, the Egyptian interviewed by ICE Attache Cairo, and M.H. ("Egyptian National Number Eleven").

43.   With respect to Egyptian National Number One, there were multiple email messages between Egyptian National One and CHUANG prior to Egyptian National Number One's application to PSA.

a.   Egyptian National Number One used email address khalednabil13@hotmail.com to communicate with CHUANG.

b.   In an email dated May 12, 2010, CHUANG told Egyptian National Number One that there was a problem with the image of Egyptian National Number One's passport that he had sent her. CHUANG stated that SEVIS was requesting a clearer image of Egyptian National Number One's passport.  Specifically, CHUANG wrote: "the SEVIS immigration have request the CLEAR copy for your passport again. because the passport you sent me is missing the other half."

c.   In an email dated May 17, 2010, CHUANG informed Egyptian National Number One that she had received his deposit of $3,200 and all of his documents.  CHUANG said the I-20 application was being processed, and that the process usually took five to seven business days.

32

      d.   In an email dated May 21, 2010, CHUANG told Egyptian National Number One that she had submitted all of his documents to SEVIS and was waiting for approval.

      e.   In an email dated June 1, 2010, Egyptian National Number One wrote the following to CHUANG: "but i am confused with something, the name of the school in the I-20 is: Pacific States Aviation (http://www.pacificstatesaviation.com/), so what is this name. am i going to Blue Diamond Aviation or Pacific States Aviation, that means when i have the interview in the embassy i will say that i am going to Pacific States Aviation. can you tell me?? because i can not understand."

      f.   In an email dated June 1,2010, CHUANG replied to Egyptian National Number One by stating: "yes you will need to go interview with the name of our partner school pacific states aviation just to pass the interview and receive the entry visa for M1 for smoother process, after you enter the United States we will register your TSA under Blue Diamond Aviation."

44.  With respect to Egyptian National Number Eleven, my review of the email account karena@bluediamondaviation.net found multiple email messages between Egyptian National Number Eleven and CHUANG.  I have reviewed these emails and learned the following:

a.    In an email dated July 27, 2009, Egyptian National Number Eleven asked CHUANG if there was any news regarding the Form I-20.

b.    In an email dated August 3, 2009, CHUANG provided Egyptian National Number Eleven with a Form I-20 from Skymates, Inc., a SEVP-approved flight school located in Texas.  In the email, CHUANG instructed Egyptian National Number Eleven to make an appointment with the United States Consulate and to bring the Form I-20 from Skymates, Inc.  CHUANG informed Egyptian National Number Eleven that Skymates, Inc. was Blue Diamond Aviation's "cooperation school."

c.    In an email dated August 5, 2009, Egyptian National Number Eleven asked CHUANG what Skymates, Inc. was. Egyptian National Number Eleven added that he had no problem mentioning Skymates, Inc. instead of Blue Diamond in the interview, but said that he did not know anything about the school.  Egyptian National Number Eleven also stated that he was concerned that immigration might ask him why he was heading to California when his school was in Texas.

d.    In an email dated August 5, 2009, CHUANG wrote Egyptian National Number Eleven that "since 9/11" the U.S. embassy was "very strict" on approving M-1 visas for students going to newer flight schools, and told Egyptian National Number

34

Eleven that it was "easier this way."  CHUANG also told Egyptian National Number Eleven that if they ask, Egyptian National Number Eleven chose to go to Skymates, Inc. based on a friend's recommendation.  CHUANG further informed Egyptian National Number Eleven that CHUANG would email Egyptian National Number Eleven a flight confirmation from Egypt to Texas to show the officer.

     e.   In an email dated September 24, 2009, CHUANG showed Egyptian National Number Eleven a flight that she had purchased for Egyptian National Number Eleven.  CHUANG stated that since the ticket was refundable, if Egyptian National Number Eleven did not use the ticket, the airline would refund the full price with no penalty fee.

     f.   In an email dated October 1, 2009, CHUANG sent Egyptian National Number Eleven an e-ticket for a flight from New York City to Dallas, Texas on Delta Airlines Flight 6740.

     g.   A review of the U.S. State Department's CCD system showed that Egyptian National Number Eleven was issued an M-1 visa to attend Skymates, Inc. on or about September 7, 2009 from the U.S. Embassy in Cairo, Egypt.  A review of U.S. Department of Homeland Security's ADIS database showed that Egyptian National Number Eleven used that M-1 visa to enter the United States on or about October 5, 2009.

h.    In an email dated October 14, 2009, CHUANG
informed Horace, a Blue Diamond Aviation employee, that Egyptian
National Number Eleven had wired $5,718 to Blue Diamond
Aviation.

45.   As part of my review of the contents of the emails
accounts used by CHUANG, I learned that CHUANG carried out the
same fraudulent conduct with respect to other foreign nationals
who wanted to enroll at Blue Diamond Aviation, including
Egyptian National Numbers Two, Eight, Nine, and Ten as well as
other Egyptian nationals and at least one national of Sri Lanka.

**I-539 Fraud**

46.   In addition to committing fraud in connection with
foreign nationals by falsifying information to obtain Forms I-
20, I also believe that CHUANG has engaged in similar fraud
involving another immigration benefit, specifically a Form I-
539.

47.   Based on my training and experience, I know that a
Form I-539 is an Application to Extend/Change Nonimmigrant
Status with U.S. Citizenship and Immigration Services (USCIS).
The Form I-539 may be used for a nonimmigrant to reinstate his
or her student status or to extend the stay of a B-2 visitor.  I
believe that CHUANG has assisted at least three of her flight
students who had entered as B-2 visitors to extend their stay in

the United States by filing Forms I-539 with USCIS.

48. As part of my investigation into CHUANG and Blue Diamond Aviation, I learned that a Sri Lankan national by the name of G.I.Y.S. ("Sri Lankan National Number One") paid Blue Diamond by five separate wire transfers for a total of $18,520.00 from July to October 2009. A review of State Department records showed that Sri Lankan National Number One had obtained an M-1 visa to attend Riverside Flight Center in Tulsa, Oklahoma. Sri Lankan National Number One used that visa to enter the United States on July 15, 2009 and departed the country on October 1, 2009. Sri Lankan National Number One's student status was subsequently terminated by Riverside Flight Center for unauthorized withdrawal.

49. During the course of my search of the email contents of karena@bluediamondaviation.net, I found emails concerning Sri Lankan National Number One. I have reviewed the following emails, and learned the following:

a. In an email dated July 16, 2009, Sri Lankan National Number One provided CHUANG with a copy of his passport, a copy of his United States visa, the Form I-20 from Riverside Flight Center, and a passport-sized photo.

b. In an email dated July 23, 2009, CHUANG sent Horace, who I believe to be a Blue Diamond employee, an

37

attachment that details Sri Lankan National Number One's package rate.

c.    In an email dated October 22, 2009, CHUANG informed Sri Lankan National Number One that she had already sent out his receipt for an I-539.

50.  On or about October 7, 2009, a Form I-539 was received by USCIS from Sri Lankan National Number One applying for a reinstatement of student status.  I have reviewed the Form I-539 and have learned the following:

a.    Sri Lankan National Number One provided CHUANG's Residence of 40 Villa Milano, Lake Elsinore, California 92532 as his address in the United States.

b.    Sri Lankan National Number One was notifying USCIS that he had transferred from Riverside Flight Center to Aero Tech Academy on September 15, 2009.  Sri Lankan National Number One stated that the reason he was transferring was because he felt that Riverside Flight Center was unsafe.

c.    The email address that Sri Lankan National Number One provided was kc0131@hotmail.com.  Information provided by Microsoft confirms the email address kc0131@hotmail.com was in fact registered by Karena CHUANG.

51.  Based on this information concerning potential fraud in connection with Form I-539 applications, on or about May 24,

38

2011, I requested the Form I-539 applications submitted to USCIS by Egyptian National Number Five, M.I. ("Egyptian National Number Twelve"), and A.E.S. ("Egyptian National Number Thirteen").

**Egyptian National Number Five**

52.  I have reviewed the Form I-539 application submitted by Egyptian National Number Five to USCIS, and have learned the following:

a.  Egyptian National Number Five submitted a Form I-539 application on or about April 1, 2011.  The address that Egyptian National Number Five provided to USCIS on his application was 1362 S. White Avenue, Pomona, California 91766 (referenced in paragraphs 15d and 15e above) which is a residence owned by CHUANG's mother Li Chu Lin and rented to Blue Diamond Aviation students.

b.  Egyptian National Number Five entered the United States as a Visitor for Pleasure on a B-2 Visitor Visa on October 30, 2010.  Egyptian National Number Five was seeking to extend the visa until May 31, 2011.

c.  A letter submitted with Egyptian National Number Five's Form I-539 application stated that the purpose of his trip to the United States was to relax.  In the letter, Egyptian National Number Five stated that he visited San Francisco, Santa

39

Barbara, Sea World, San Diego Zoo, Disneyland, Universal Studios, Las Vegas, New York, Miami, Arizona and other sites during the past five months in the United States.  Egyptian National Number Five stated that he would like to extend his stay in order to visit Washington, D.C.  No mention of attending Blue Diamond Aviation was made in the letter.

53.  In the course of searching through the contents of karena@bluediamondaviation.net as a result of a federal search warrant, I found email messages between Egyptian National Number Five and CHUANG.  I have reviewed the following messages, and learned the following:

a.  In an email dated March 22, 2011, Egyptian National Number Five provided CHUANG with several of his Bank of America bank account statements.

b.  In an email dated March 31, 2011, CHUANG told Egyptian National Number Five that she needed him to write an explanation letter of why he needed to extend his visa.  CHUANG instructed Egyptian National Number Five to use the sample letter that she attached to give Egyptian National Number Five an idea of how to write it.  CHUANG told Egyptian National Number Five to email the letter back to her when he was done, and CHUANG would adjust it for him and mail it out to immigration.

c.    The sample letter that CHUANG provided Egyptian National Number Five in the March 31, 2011 email was a letter dated May 1, 2010 from Egyptian National Number Twelve requesting a Form I-539 extension.

**Egyptian National Number Twelve**

54.  I have reviewed the Form I-539 application submitted by Egyptian National Number Twelve to USCIS, and have learned the following:

a.    Egyptian National Number Twelve entered the United States as a Visitor for Pleasure on a B-2 Visitor Visa on November 19, 2009.  Egyptian National Number Twelve was seeking to extend the visa for 30 days beyond May 18, 2010, which was the date he was required to depart.

b.    The address that was provided by Egyptian National Number Twelve on the Form I-539 to USCIS was 1362 S. White Avenue, Pomona, California, a residence I know is owned by CHUANG's mother and rented to Blue Diamond students.  Egyptian National Number Twelve submitted the Form I-539 in an envelope that was post-marked May 12, 2010 in Lake Elsinore, California.

c.    A letter that is virtually identical to the one sent from CHUANG to Egyptian National Number Five to use as a sample (see paragraph 52 above) was found in Egyptian National Number Twelve's Form I-539 application.  In the letter, Egyptian

41

National Number Twelve stated that during the past months since arriving in the United States, he had visited Disneyland, Universal Studios, San Diego Zoo, Sea World, Wild Animal Park, Big Bear Lake, Beverly Hills, Las Vegas, San Francisco, and New York.  Egyptian National Number Twelve also informed USCIS that he stayed with his friend Karena Chuang at 1362 S. White Avenue, Pomona, California 91766.  Egyptian National Number Twelve stated that he wanted to stay longer so that he could visit his friend in Miami.  No mention of attending Blue Diamond Aviation is made in the letter.

**Egyptian National Number Thirteen**

55.  I have reviewed the Form I-539 application submitted by Egyptian National Number Thirteen to USCIS, and have learned the following:

a.    Egyptian National Number Thirteen submitted a Form I-539 on or about May 1, 2011 to USCIS.  The address that Egyptian National Number Thirteen provided to USCIS is 1497 S. White Avenue, Pomona, California 91766, a residence that I believe is rented by CHUANG to provide housing for flight students.

b.    Egyptian National Number Thirteen entered the United States on November 13, 2010 as a Visitor for Pleasure on a B-2 Visitor Visa.  Egyptian National Number Thirteen was

42

seeking to extend his stay for 30 days beyond May 12, 2011, which was the date he was required to depart.

       c.   A letter submitted with Egyptian National Number Thirteen's application stated that the purpose of his trip to the United States was to relax. Egyptian National Number Thirteen stated that he visited San Francisco, San Diego, Las Vegas, Arizona, Washington DC, New York, and Boston during this visit. Egyptian National Number Thirteen stated that he was a manager and shareholder of a clothing company in Egypt. He also stated that he wanted to extend his trip in order to go to a fashion show in Los Angeles and to return to Las Vegas for designer brand shopping. No mention of attending Blue Diamond Aviation is made in the letter.

    56.  In the course of searching through the contents of karena@bluediamondaviation.net as a result of a federal search warrant, I found email messages between Egyptian National Number Thirteen and CHUANG. I have reviewed the following messages, and learned the following:

       a.   Egyptian National Number Thirteen first contacted Blue Diamond Aviation on October 27, 2010, stating that he was applying for Blue Diamond and that his friend Hesham had just finished training at Blue Diamond. Egyptian National Number

43

Thirteen informed Blue Diamond that he has a B1/B2 visa that did not expire until July 2013.

b.    In an email dated November 3, 2010, CHUANG informed Egyptian National Number Thirteen that it was ok to train on a B1/B2 visa as long as Egyptian National Number Thirteen completed his TSA registration.

c.    In an email dated November 11, 2010, CHUANG coached Egyptian National Number Thirteen on what to say to U.S. immigration officials when applying for entry into the United States.  CHUANG stated the following to Egyptian National Number Thirteen: "p.s. just a reminder for you to get through immigration smoother: if they ask why you are here for: you say, visit my friends in Pomona, take sightseen [sic] tour, ski, and also you want to take flight tour/lesson "for fun". if they ask about the flight training. otherwise just keep it simple."

d.    In another email dated November 11, 2010, CHUANG further instructed Egyptian National Number Thirteen on what to say to immigration officials, including informing Egyptian National Number Thirteen where he would stay and the name of the friend that Egyptian National Number Thirteen should provide to officials.  CHUANG stated the following to Egyptian National Number Thirteen: "you will stay with your friend in his house in Pomona. 1362 s. white ave. Pomona ca 91766 and you plan to stay

44

for 2-3 months. that way they will give you six month or more. and show him your return ticket and tell him it's open return date ticket. the key point is to give him the impression that "you will not stay here to work" "you have money to spend in USA, "You have good job and family in egypt so you don't wanna stay in USA for living" "you are here to spend money and have fun"."

e.   In an email dated November 11, 2010, Egyptian National Number Thirteen wrote to CHUANG the following: "So I will tell them that I will take flight lessons for fun should I show them the acceptance mail that the TSA send it to me."

f.   In another email dated November 11, 2010, CHUANG instructed Egyptian National Number Thirteen not to mention anything about flight training unless the official asked. CHUANG stated the following: "I understand it's not the first time but these day even I have airlines crew having hard time to go through. Your friend is Horace Yang 949-331-8884. You don't have to mention anything regarding the flight or tsa unless they ask."

57.   I believe that CHUANG coached Egyptian National Number Thirteen on what to say to immigration officials because she knew that Egyptian National Number Thirteen might be denied entry to the United States if he disclosed to immigration

45

officials that he was here to undergo flight training on a B1/B2 visa.

58.   A review of U.S. Department of Homeland Security's ADIS database showed that Egyptian National Number Thirteen in fact used a B-2 Visitor Visa to enter the United States on or about November 13, 2010.  Upon arrival, on or about November 13, 2010, I know that Egyptian National Number Thirteen sent an email to CHUANG stating that he had arrived and was waiting to be picked up.

**Wright Aviation Academy**

59.   On or about July 11, 2011, I spoke with Egyptian National Number Three and learned that Blue Diamond Aviation had closed and reopened in a new location in Brackett Field under the name Wright Aviation Academy.

60.   On or about July 28, 2011, surveillance was conducted at Brackett Air Field located in La Verne, California.  I went to 1615 McKinley Avenue, Suite B, La Verne, California and saw that the Blue Diamond Aviation facility was unoccupied and that there was a sign in the window that said, "Closed."  I then drove to 1100 Puddingstone Drive, La Verne, California and observed the following:

a.   There was a building with a large sign that said Wright Aviation Academy and Shong Mai International.

b.     A white Infiniti with California license plate #5ACY998 and a white Honda Accord with California license plate #4HYK900 were parked in the parking area of Wright Aviation Academy.  A license plate check confirmed that the white Infiniti was registered to CHUANG at CHUANG's Residence and the white Honda was registered to Wei Shih of 1362 S. White Avenue, Pomona, California.  Wei Shih was previously determined to be a student at Blue Diamond Aviation who resided at housing provided by Blue Diamond Aviation located at 1362 S. White Avenue, Pomona, California.

c.     Two planes were parked on the tarmac outside the Wright Aviation Academy facility.  One plane had tail number N4672J and the other plane had the tail number N4355L.  A search of the email content of karena@bluediamondaviation.net revealed an email dated June 23, 2009 from CHUANG (karena@bluediamondaviation.net) to Horace (horace@bluediamondaviation.net) which contained an insurance policy for coverage of a Cessna 172 with tail number N4355L issued to Shong Mai International/Li Chu Lin of 40 Villa Milano, Lake Elsinore, CA.

61.  On or about August 26, 2011, I spoke with Dave Mousaw, an Inspector with the Transportation Security Administration (TSA).  Inspector Mousaw informed me that the TSA inspected

47

Wright Aviation Academy on or about August 12, 2011.  According to Inspector Mousaw, the following was learned during the inspection:

  a. Sam Chuang (CHUANG's brother) and Horace Yang, former flight instructors at Blue Diamond Aviation, were both currently flight instructors at Wright Aviation Academy.

  b. Inspector Mousaw interviewed Sam Chuang and Sam Chuang stated that Karena CHUANG was in charge of Wright Aviation Academy.  Sam Chuang also stated to Inspector Mousaw that Wright Aviation Academy is owned by Shong Mai International.

  62. Based on the foregoing, I believe that Wright Aviation Academy is a new flight school operated by CHUANG that utilizes a number of the same employees and resources of Blue Diamond Aviation.  Based on my training and experience, I know it is likely that many of Blue Diamond Aviation's files and records will have been moved to Wright Aviation Academy.  As such, I believe there is probable cause to believe that Wright Aviation Academy will contain evidence of violations of 8 U.S.C. § 1324 (Bringing in and Harboring Aliens) and 18 U.S.C. § 1546 (Fraud and Misuse of Visas, Permits, and Other Documents).

  63. As set forth above, CHUANG was the principal owner/operator of Blue Diamond Aviation.  Based on my training

and experience, I know that it is not uncommon for principal owners of businesses to keep business records at their residence and have specific reason to believe that CHUANG kept Blue Diamond records at her home. Specifically, in a recorded conversation with Egyptian National Number Three on December 16, 2010, CHUANG told Egyptian National Number Three that she could not provide him with a particular document because she was not at home and therefore did not have her files. Accordingly, I believe there is probable cause to believe that CHUANG's Residence will contain evidence relating to violations of 8 U.S.C. § 1324 and 18 U.S.C. § 1546.

**CHUANG's Border Crossing on November 10, 2011**

64. On or about November 10, 2011, I was contacted by U.S. Customs and Border Protection ("CBP") Officer Hernandez and was told that CHUANG entered the United States at Los Angeles International Airport, returning from Taiwan. Officer Hernandez informed me that CHUANG had in her possession a silver and black Sony laptop. CHUANG informed Officer Hernandez that she used the Sony laptop for her flight training school business.

65. Officer Hernandez also provided me with photocopies of CHUANG's passport. My review of those copies showed that CHUANG had previously traveled to Egypt, Sri Lanka as well as Taiwan.

49

**CHUANG's Vehicle**

66.  Based on my surveillance of CHUANG, I know that CHUANG primarily operates a silver Mercedes Benz SLK, two-door roadster with California license plate # 4YVM208.  The vehicle is registered to CHUANG's mother, Li Chu Lin.  Based on my training and experience, I know that business owners will transport business records, documents, and other business-related paperwork in their vehicles between their residence and place of business.

**Training and Experience on Digital Devices**

67.  As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes used to store digital data (excluding analog tapes such as VHS), and memory chips; and security devices.  Based on my knowledge, training, and experience, as well as information

50

related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are many types of digital devices and software in use today that it takes time to conduct a thorough search.  In addition, it may also be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, software application or operating system that is being searched.

b.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices
will typically be so large that it takes substantial time to
search such devices properly.  A single megabyte of storage
space is the equivalent of 500 double-spaced pages of text.  A
single gigabyte of storage space, or 1,000 megabytes, is the
equivalent of 500,000 double-spaced pages of text.

d.   Electronic files or remnants of such files can be
recovered months or even years after they have been downloaded
onto a hard drive, deleted or viewed via the Internet.
Electronic files saved to a hard drive can be stored for years
with little or no cost.  Even when such files have been deleted,
they can be recovered months or years later using readily-
available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on the hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed via the

52

Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

     e.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processor, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently

associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

   f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was

54

being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

**Items to be Seized**

68.  The items to be seized, which are believed to be evidence, instrumentalities, and fruits of violations of Title 8, United States Code, Section 1324 and Title 18, United States Code, Sections 1546, 2, 371:

a.  For the period of 2006 to the present, records identifying students enrolled at Blue Diamond Aviation, including student correspondence, applications, transcripts, flight log books, rosters, ledgers, files, class schedules, photos, syllabuses, test materials, instruction materials, and acceptance letters;

b.  For the period 2006 to the present, all documents and records related to the entrance into and departure from the United States by foreign individuals, including immigration

applications, petitions, entry visa applications and departure records;

c.   For the period 2006 to the present, all documents and records used or submitted, or to be used or submitted, to schools, U.S. consular officials, Transportation Security Administration officials, Federal Aviation Administration officials, and/or United States immigration personnel, in connection with immigration and/or entry visa applications and petitions by foreign individuals, and/or to maintain immigration status in the United States, including Forms I-20 Certificates of Eligibility, Forms I-539 Application to Extend/Change Nonimmigrant Status, draft Forms I-20, draft Forms I-539, correspondence and approval notices from schools and flight training institutions, and all documents submitted or to be submitted to the Student and Exchange Visitor Information System ("SEVIS");

d.   For the period 2006 to the present, all documents and records relating to schools and flight training institutions in the United States which accept and/or train foreign individuals, including but not limited to, brochures, business cards, pamphlets, and marketing materials;

e.   For the period of 2006 to the present, all documents and records relating to payments made by foreign

56

individuals to Karena CHUANG (also known as "Jessika"), Li Chu

Lin, Blue Diamond Aviation, and Wright Aviation Academy and all

documents or records relating to payments made by foreign

individuals to any school or flight training institutions in the

United States, including general journal ledgers, cash receipts,

credit card receipts, disbursement journals and ledgers, charts

of accounts, source documents for journal and ledger entries,

invoices, daily summary sheets, petty cash tickets, cash receipt

notes, billing records, and contracts;

      f.   For the period of 2006 to the present, all

documents and records related to the receipt and/or distribution

of profits, proceeds, and revenue generated from the fraud

scheme conducted by Karena CHUANG (also known as "Jessika"), and

others, including all bank statements, tax returns, checks,

deposit items, check registers, credit card receipts, invoices,

money orders, travelers checks, and cashier checks;

      g.   For the period of 2006 to the present, all

correspondence, electronic mail, notes, telephone messages,

internal memoranda, appointment books, calendars, address books,

journals, telephone books, telephone records, personal

organizers, photographs, and contact information related to

recruitment and enrollment of foreign nationals in Blue Diamond

Aviation, and/or Wright Aviation Academy, or any other flight

school in the United States;

h.   For the period of 2006 to the present, indicia of occupancy, use, and/or control of any real estate that may be leased or otherwise provided for students who trained at Blue Diamond Aviation and/or Wright Aviation Academy;

i.   For the period of 2006 to the present, any licenses, certifications, or other documents issued by the Federal Aviation Administration, or other recognized foreign or domestic aviation regulatory body, including all pilot licenses, air agency certificates, identification cards, and evaluation materials.

j.   With respect to any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show the actual user of the digital device during the time period 2006 to the present.

k.   As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device

58

capable of storing and/or processing data in digital form,
including: central processing units; laptop or notebook
computers; personal digital assistants; wireless communication
devices such as telephone paging devices, beepers, and mobile
telephones; peripheral input/output devices such as keyboards,
printers, scanners, plotters, monitors, and drives intended for
removable media; related communications devices such as modems,
cables, and connections; storage media such as hard disk drives,
floppy disks, compact disks, magnetic tapes used to store
digital data (excluding analog tapes such as VHS), and memory
chips; and security devices.

1.   In searching for digital devices and in searching
digital data stored on digital devices, law enforcement
personnel executing this search warrant will employ the
following procedure:

i.   Law enforcement personnel or other
individuals assisting law enforcement personnel will, in their
discretion, either search the digital device(s) on-site or seize
and transport the device(s) to an appropriate law enforcement
laboratory or similar facility to be searched at that location.
The team of law enforcement personnel, which may include the
investigating agent(s), and/or individuals assisting law
enforcement personnel searching the digital device(s) shall

complete the search as soon as is practicable but not to exceed 60 days from the date of execution of this warrant. If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

ii.   The team searching the digital devices will do so only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

A.   The team may subject all of the data contained in the digital device or the forensic copy capable of containing items to be seized as specified in this warrant to the protocols to determine whether the digital device and any data falls within the items to be seized as set forth herein. The team searching the digital device may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine, pursuant to the protocols, whether the data falls within the list of items to be seized as set forth herein.

B.   The team searching the digital device also may use tools to exclude normal operating system files that do not need to be searched.

iii. When searching a digital device pursuant to the specific protocols selected, the team searching the digital

device shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

       iv.  If the team searching a digital device pursuant to the selected protocols encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that digital device pending further order of Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered , including how it was immediately apparent contraband or evidence of a crime.

       v.  At the conclusion of the search of the digital devices as set forth in subparagraph (a) above, any digital device determined to be itself an instrumentality of the offense(s) and all the data thereon shall be retained by the government until further order of court or one year after the conclusion of the criminal case/investigation.

       vi.  At the conclusion of the search of the digital devices as set forth in subparagraph (a) above, the government shall retain, for purposes of authenticity and later challenge and review by the defense in any criminal case, all of the digital data on any digital device found to contain digital data falling within the scope of the items to be seized.

61

vii. Notwithstanding the above, after the completion of the search of the digital devices as set forth in subparagraph (a) above, the government shall not access digital data falling outside the scope of the items to be seized in this warrant on any retained digital devices or digital data absent further order of court.

viii. If the team determines a digital device is not an instrumentality of any offense under investigation and does not contain data falling within the list of items to be seized, the team shall return the device as soon as is practicable.

m.   In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

i.   Any digital device capable of being used to commit, further or store evidence of the offense listed above;

ii.   Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

62

iii. Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

iv. Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

v. Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

vi. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

vii. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

n. The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not

apply to any search of digital media pursuant to any other court order.

**Sealing Request**

69.   I request that the Court seal this affidavit until CHUANG's arrest.   CHUANG has not been taken into custody and has not been informed that she is being named as a defendant in a complaint.   The likelihood of apprehending her might be jeopardized if the affidavit in this case were made publicly available before CHUANG is taken into custody on the complaint. Further, the likelihood of discovering the items sought in the search warrants might be jeopardized if the affidavit were made publicly available before the warrants are executed. Accordingly, I request that the Court issue an order sealing this affidavit until further order of the Court.

**Conclusion**

70.   Based on the foregoing, I believe that there is probable cause to believe that Karena CHUANG, has violated Title 8, United States Code, Section 1324 (Bringing In and Harboring Certain Aliens), and Title 18, United States Code, Sections 1546 (Fraud and Misuse of Visas, Permits, and Other Documents), 2 (Causing an Act to be Done), and 371 (Conspiracy).

Additionally, I believe there is probable cause to believe that CHUANG's Business, CHUANG's Residence as well as CHUANG's

Computer and CHUANG's Vehicle, described herein

and further described in Attachment A, will contain evidence,

fruits, and instrumentalities relating to the above violations,

which evidence, fruits, and instrumentalities are further

described in Attachment B.


_____
George Kwai
ICE/HSI Special Agent


Sworn and subscribed to before me

on this __17__ day of November, 2011

ANDREW J. WISTRICH

UNITED STATES MAGISTRATE JUDGE